**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

United States of America,                                    Case No. 3:13CR134

        Plaintiff

        v.                                                              **ORDER**

Michael G. Wymer,

        Defendant

      In this criminal case, the government alleges defendant Michael G. Wymer participated in a conspiracy to steal tractor-trailers traveling in interstate commerce.

      Pending is Wymer's motion to suppress video evidence captured via a surveillance camera mounted on a utility pole overlooking Wymer's property. (Doc. 227). I held a suppression hearing on June 6, 2014, and the matter is now fully briefed.

      Despite my considerable reservations about the failure of the officers to have secured a warrant to conduct such highly intrusive surveillance, I conclude I must, in light of controlling law, deny the motion.

**Background**

      In mid-2012, Wymer's son purchased three pieces of property near the intersection of Sterling and Center Streets in Toledo, Ohio.

      The first parcel was an industrial lot located at 660 Sterling Street. The second was as an industrial lot located at 0 Center Street, immediately to the west of the first lot. The third was a residential parcel at 661 Sterling, just across from the two industrial lots.

A map from the Lucas County Auditor's Office shows there was no barrier between the two industrial lots. Thus, although the lots have separate addresses, they appear to form a single, continuous lot, with Center Street marking its western boundary and Sterling Street markings its southern boundary.

A chain-link fence surrounded the lot on all sides.

From the property located at 660 Sterling Street[1] Wymer ran a recycling, salvage, and automobile-repair business called S&D Recycling and Automotive. He described the property as a "shop, garage." (Doc. 252 at 14).

Wymer ran his business from a large, enclosed garage located about three hundred feet east of Center Street and about half that distance from Sterling Street.

According to Wymer, a customer or any member of the public could enter the property during normal business hours. Two driveways, one on Center Street and one on Sterling Street, afforded access to the property. During business hours, employees would open the chain-link gates that blocked the driveways. They would close the gates at night.

Wymer testified that anyone standing at either the Center Street or the Sterling Street driveway would have a direct, unobstructed line of sight to the garage. He agreed there were no barriers or objects along the Sterling Street side of the property that could have obstructed a passerby's view of the garage and its surroundings.

However, a twelve-foot mound of asphalt shavings and vegetation, which began just north of the Center Street driveway and ran to the property's northern boundary, covered the entire

---

[1] The record contains various references to property located at 642 Sterling Street. However, the parties agree that the address of 642 Sterling and 660 Sterling refer to the same piece of property.

northwest corner of the property. The mound blocked all views of Wymer's garage from Center Street north of the driveway.

Wymer also testified that, from August to perhaps December, 2012, he lived in an RV that he parked on the south side of the garage.

A second business – Klosterman's Bakery – operated in the southwest corner of Wymer's property. Wymer allowed the bakery to run a distribution center on the property, and he testified the bakery's trucks used the Center Street driveway to enter and exit the property.

Wymer introduced no evidence the bakery had a duty to exclude the public from its part of the property.

In September, 2012, Ohio authorities received reports that stolen trucks, trailers, and cargo were present on Wymer's property.

Investigator Sean Rizor of the Ohio Bureau of Motor Vehicles conducted preliminary physical surveillance of Wymer's property. However, physical surveillance proved difficult because the property was in "a fairly isolated and not regularly frequented area." (Doc. 252 at 173). Officers trying to conduct surveillance "looked like fish out of water sitting there." (*Id.* at 172).

Authorities therefore requested the Ohio Bureau of Criminal Investigation (BCI) to install a video camera on a utility pole overlooking Wymer's property.

BCI Special Agent Matthew Cesareo was responsible for installing the pole camera.

He visited Wymer's property and identified a utility pole on Center Street, about ten feet north of the driveway, as a suitable location for the camera. Cesareo then consulted the Lucas County Auditor's map database and verified the pole was outside Wymer's property line – a determination that is not in dispute.

Neither Cesareo nor any other law enforcement officer involved in the case sought a warrant to conduct the video surveillance.

Agent Cesareo was present on September 20, 2012, when a Toledo Edison mounted the camera about fifteen or twenty feet above the ground. In an officer monitored the device – a "PanTel zoom" camera – real-time, he or she could cause it to pans from side to side, tilts up and down, and zooms in and out.[2]

The camera provided a continuous, real-time feed of the activities at Wymer's property.

Cesareo and Rizor testified the camera allowed them to see over the mound of asphalt shavings and vegetation blocking the street-level view of Wymer's garage, and gave them an unobstructed view of the exterior of Wymer's garage and its surroundings.

While the camera was operating, agents observed Wymer coming and going from the property at all hours of the day and night. According to Investigator Rizor, it did not appear that Wymer lived on the property.

Video surveillance continued until early February, 2013, when officers executed search warrants at 660 Sterling Street.

## Discussion

The Fourth Amendment protects "[t]he rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV.

A search can occur in two ways.

---

[2] However, even with the zoom function, the camera could not record the interior of the garage.

First, "a physical trespass for the purpose of gathering information constitutes a trespassory search prohibited by the Fourth Amendment." *U.S. v. Mathias*, 721 F.3d 952, 956 (8th Cir. 2013).

Second, a search occurs if the government violates a person's reasonable expectation of privacy. Under the test announced in *Katz v. U.S.*, 389 U.S. 347, 367 (1967) (Harlan, J., concurring), a court asks whether: 1) the defendant "manifested a subjective expectation of privacy in the object of the challenged search"; and 2) the defendant's expectation of privacy is objectively reasonable. *Kyllo v. U.S.*, 533 U.S. 27, 33 (2001).

### A. Trespassory Search

Wymer argues that installing the pole camera and conducting video surveillance of his property was a trespassory search. He maintains that, "[i]n reality the camera entered the premises for the purpose of obtaining information." (Doc. 260 at 15).

This argument lacks merits.

Wymer concedes "the video camera was not installed on [his] property." (*Id.*). And without a trespass onto his property, there was no trespassory search. *U.S. v. Jones*, 565 U.S. —, —, 132 S. Ct. 945, 954 (2012) ("Situations involving merely the transmission of electronic signals without trespass . . . *remain* subject to *Katz* analysis") (emphasis in original).

### B. Expectation of Privacy

The closer question is whether the government violated Wymer's reasonable expectation of privacy with its covert and continuous video surveillance of the premises for four months.[3]

### 1. Commercial Property

---

[3] I assume, *arguendo*, Wymer manifested a subjective expectation of privacy in the garage and its environs, and proceed directly to the second prong of the *Katz* test.

5

One factor militating against Wymer's argument is that the object of the surveillance here was commercial property.

While a "businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property," *See v. City of Seattle*, 387 U.S. 541, 543 (1967), "[an] expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987).

Thus, the owner of commercial property can claim only a diminished expectation of privacy in that property. As a result, a government intrusion that amounting to a search if conducted in or around a home does not necessarily constitute a search if conducted on commercial property. *Compare Florida v. Jardines*, 569 U.S. —, 133 S. Ct. 1409, 1414-1417 (2013) (officer's entry onto curtilage and use of drug-sniffing dog at front door of defendant's home constituted trespassory search), *with U.S. v. Parilla*, 2014 WL 2111680, *7-9 (S.D.N.Y.) (officer's entry onto commercial property to conduct dog-sniff near a cargo bay did not constitute search).

Here, I find Wymer's property was commercial property. Wymer testified he ran S&D Recycling and Automotive from the property, and that he allowed a bakery to conduct business on the property.

To be sure, Wymer testified he lived on the property for roughly four months, sleeping in an RV parked next to his garage.

However, I do not credit Wymer on this score. His testimony he lived on the property continuously from August to December, 2012, was vague and uncertain. Moreover, Investigator Rizor testified credibly that Wymer did not appear to live on the property.

6

Accordingly, because Wymer used the property almost entirely for commercial purposes – and allowed another business to operate on the property – he can claim only a diminished expectation of privacy in his activities there.

### 2. Exposed to Public View

Second, Wymer's failure to shield the property from public view and access further undermines his already diminished expectation of privacy.

"[W]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, *supra*, 389 U.S. at 351.

"The reason why there is no reasonable expectation of privacy in an area that is exposed to the public is that little diminution in the amount of privacy and freedom remaining to citizens will result from police surveillance of something that any passerby can see." *Florida v. Riley*, 488 U.S. 445, 457 (Brennan, J., dissenting).

Case law is clear, moreover, that failing to take measures to hinder public view amounts to knowing exposure of that property to the public. *U.S. v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013) ("Fillers knowingly exposed the entire site to public access by not doing anything to exclude the public.").

Here, any passerby on Sterling Street would have an unobstructed view of the property through the chain-link fence. The same passerby would have perhaps an even better look at the garage from the Sterling Street driveway. *Cf. California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

To be sure, Center Street afforded a poorer view of the garage. As Agent Cesareo, Investigator Rizor, and Wymer each testified, a person standing next to the utility pole on which authorities mounted the camera could not see Wymer's garage at all.

However, a person standing only a few feet south of the pole, near the Center Street driveway, would have an unobstructed view of the garage.

For these reasons, I find Wymer so completely exposed his property to public view to preclude his claim of a reasonable expectation of privacy in whatever activities he conducted there. *Mathis*, *supra*, 738 F.3d at 732.

Wymer emphasizes the pole camera allowed authorities to obtain an unobstructed view of the garage over the mound of asphalt shavings that blocks the street-level view of the garage from Center Street. He contends that, because a passerby near the utility pole could not see his garage, installing a camera that bypassed the street-level barriers amounted to a search.

As the court explained in *U.S. v. Krawczyk*, 2013 WL 3853213, *2 (D. Ariz.), "the location of surveillance cameras is not significant under the *Katz* reasonable expectation analysis in the same way that location matters under the trespass analysis used in *U.S. v. Jones*[.]"

The Fifth Circuit's decision in *U.S. v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987), a case on which Wymer heavily relies, illustrates the point.

Authorities in that case obtained a Title III order to conduct video surveillance of the defendant's backyard. The record showed defendant had erected an opaque, ten-foot-tall metal fence, and that authorities had no line of sight into the backyard, save for the video camera.

The Fifth Circuit held the use of video surveillance to record the goings-on in defendant's backyard was a search. *Cuevas-Sanchez*, *supra*, 821 F.3d at 251.

What mattered to the court's analysis was not the location of the camera, standing alone. Rather, what mattered was that, in erecting the fence and thus shielding the backyard from view, the defendant had manifested an objectively reasonable expectation of privacy in his backyard.

Wymer's case is nothing like *Cuevas-Sanchez*. Although a passerby standing next to the utility pole could not see Wymer's garage, it is undisputed the garage was visible from the Center Street driveway, the entire Sterling Street side of the property, and the Sterling Street driveway.

Instead, the case is closer to *Krawczyk, supra*, 2013 WL 3853213, *2, where the court held no search occurred when "pole cameras viewed activities that a person *standing at a different vantage point could also have observed*." *Id.* (emphasis added).

In these circumstances, Wymer cannot claim a legitimate expectation of privacy in his activities at the garage. Nor can he fairly claim, given the multiple, unobstructed lines of sight into his property, he did not knowingly expose his garage to public view.

Neither the isolated nature of the premises (and lack of passersby on foot or in motor vehicles) nor the fact that the camera was on during the nighttime gives vitality under current law to the reasonableness of Wymer's expectation of privacy. He has not cited, and I am not aware of any cases, much less prevailing caselaw, that makes an exception for isolated areas or lightly traveled roadways. What matters is whether someone who happened to pass by could view what was going on because the owner had not sought to conceal his activities.

Likewise, the camera saw nothing at night that someone could not view. In all likelihood, moreover, whatever "business" Wymer was doing in the night season was not related to his legitimate recycling and repair operations during normal business hours. Had he wanted to conceal

9

his nocturnal "business" from the risk of observation (when he would most likely be most concerned about being observed), he could and should have conducted that activity in his garage.

### 3. Business Curtilage

Third, I reject Wymer's claim his garage should receive heightened protection from governmental intrusion because it is business curtilage.

Neither the Supreme Court nor the Sixth Circuit "has decided whether there is such a thing as business curtilage." *U.S. v. Mathis*, 738 F.3d 719, 730 (6th Cir. 2013). Indeed, at common law the concept of curtilage was – and in today's Supreme Court cases still is – inextricably linked to the home. *Parilla*, *supra*, 2014 WL 2111680, at *4-5.

The Court "regard[s] the area immediately surrounding and associated with the home – what [the] cases call the curtilage – as part of the home itself for Fourth Amendment purposes." *Jardines*, *supra*, — U.S. at —, 133 S. Ct. at 14. Perhaps for that reason, "the area surrounding a business has never been considered part of the business itself[.]" *Parilla*, *supra*, 2014 WL 6111208, at *4.

However, I need not decide whether the Fourth Amendment protects business curtilage.

"While there "may be circumstances in which the area adjoining a business structure is sufficiently private to enjoy a protection analogous to a home's curtilage,"the Sixth Circuit stated in *U.S. v. Elkins*, 300 F.3d 638, 653-654 (6th Cir. 2002), it nonetheless "is clear that areas that adjoin a commercial building but are accessible to the public do not receive curtilage-like protection."

It is undisputed Wymer's property was "accessible to the public" during normal business. Far from excluding the public, Wymer invited them onto the property to conduct business. Under *Elkins*, Wymer's commercial property – even if, in other circumstances, the law might protect someone's "business curtilage" – does not qualify for curtilage-like protection.

Wymer cannot avoid this result by claiming the pole cam recorded activities occurring in the curtilage of his RV. Even assuming the RV was Wymer's primary residence from August to December, Wymer has made no showing the area immediately surrounding the RV qualifies as curtilage. Living in an RV parked on commercial premises does not automatically convert some portion of those premises into an area "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *U.S. v. Dunn*, 480 U.S. 294, 301 (1987).

To decide whether a particular area qualifies as curtilage, courts consider: 1) the proximity of the area claimed to be curtilage to the home; 2) whether the area is included within an enclosure surrounding the home; 3) the nature of the uses to which the area is put; and 4) and the steps taken by the resident to protect the area from observation by people passing by." *Id.*

Here, there is no evidence that a fence or other enclosure surrounded Wymer's RV.

There is likewise no evidence of what, if any, intimate activities ordinarily associated with the home Wymer and his colleagues conducted on the area immediately surrounding the RV. Indeed, the only example Wymer cites of "intimate behavior" captured by the surveillance is a picture of a man smoking a cigarette.

Nor is there any evidence Wymer erected a fence or other barrier around his RV.

For these reasons, I decline to find the area adjoining Wymer's RV is entitled to protection as part of the RV's curtilage.

### 4. Severity of the Governmental Intrusion

Despite the foregoing, I share much of Wymer's concerns regarding the intrusive nature of the surveillance at issue.

The pole camera recorded Wymer's garage on continuous, 24/7 basis for nearly five months. So much evidence, government poured forth from the camera that, according to government agents, it was impossible to monitor the feed in real time.

The government's attempt to liken the pole camera to a mere nosy neighbor, like Ned Flanders from *The Simpsons* or Gladys Kravitz on *Bewitched*, is, to say the least, unconvincing.

So, too, is the government's attempt to downplay the intrusiveness by arguing other forms of surveillance are even more intrusive. That GPS tracking may gather more detailed facts and more intimate information about its object does nothing to undermine the fact that the video surveillance at issue here was highly intrusive.

Justice Sotomayor's description in *Jones* about GPS tracking applies equally to video surveillance. Like GPS tracking, video surveillance "is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: limited police resources and community hostility." *Jones*, *supra*, 565 U.S. at —, 132 S. Ct. at 956 (Sotomayor, J., concurring).

Given the uniquely intrusive nature of continuous and prolonged video surveillance, and the ease with it permits law enforcement to evade ordinary checks on their ability to observe the daily activities of citizens, the far better practice is to apply for a warrant.

However, given current and prevailing law, I cannot conclude the use of long-term video surveillance to monitor Wymer's open and exposed commercial property amounted to a search. Accordingly, the failure to secure a warrant to conduct that surveillance provides no basis to suppress the evidence obtained via the pole camera.

**Conclusion**

For the reasons set forth above, it is

ORDERED THAT Wymer's motion to suppress evidence captured via the pole camera (Doc. 227) be, and the same hereby is, denied.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge
