# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Michael G. Wymer,                       Case No. 3:13CR134

    Movant-Defendant,

v.                                           **ORDER**

United States of America,

    Respondent-Plaintiff.

    A jury convicted Michael G. Wymer, a career truck thief and chop shop operator, and three of his confederates of conspiracy under 18 U.S.C. § 371, and him of fourteen substantive counts of stealing trucks, cutting them up, and selling their remains and, often, their cargoes, for scrap. I sentenced him to 324 months' imprisonment. (Doc. 445). The Sixth Circuit affirmed. *U.S. v. Wymer*, 654 F. App'x 735 (6th Cir. 2016).

    Complaining that he did not receive effective assistance of counsel, Wymer has moved to vacate his conviction and sentence under 28 U.S.C. § 2255. (Doc. 589).

    Finding the motion without any merit, I deny it. I also decline to issue a certificate of appealability.

## Background

    After Wymer's first attorney withdrew due to communication problems, I appointed first one attorney (John McMahon) and then another as co-counsel (Merle Dech). I then appointed a third attorney (Spiros Cocoves) to assist at sentencing.

Shortly after the grand jury returned its indictment, Wymer and his attorney met with government counsel and federal agents for, presumably, what is commonly called a "proffer" session. During that session, Wymer admitted his complicity in the charged offenses. Though the government had agreed that it could not directly introduce Wymer's proffer statements at trial, Wymer understood it could use any portion of what he had said in the event he testified or offered evidence inconsistent with his proffer. (Doc. 591 at 11).

Consequently, his trial attorneys, though not shackled entirely, were tightly constrained in what they could develop and implement as a trial strategy. Most simply put: as a practical matter, Wymer could not testify nor could his attorneys offer any evidence on his behalf. If he or they presented anything consistent with the proffer, it would be inculpatory; if inconsistent, the Damoclean Sword would fall.

With little to work with, Wymer's counsel sought to suppress evidence obtained via a pole camera adjacent to and overlooking the yard of his chop shop. Though prevailing doctrine made success unlikely,[1] that was their – and Wymer's – best, indeed only, option. After losing that preliminary round, *U.S. v. Wymer*, 40 F. Supp. 3d 933 (N.D. Ohio 2014), there was not much left to try at trial. They could quibble and nibble, but that was about it.

The simple truth is that the government's case was unbeatable. A GPS unit on Wymer's car showed him driving when, and to where, a truck was stolen and returning, along with the truck, to

---

[1] *See* Carr, Bellia, and Creutz, THE LAW OF ELECTRONIC SURVEILLANCE, § 3:76, pp. 308–16 (2017) (Thomson/West).

the chop shop.[2] Surveillance cameras that Wymer himself had installed inside the chop shop showed what happened next: the gang rendering the trucks and their cargo into scrap.[3]

And then there were the witnesses: law enforcement officers and federal agents, several owner-victims and former confederates, including Wymer's son, Shawn Wymer, who had, in the vernacular, decided to work for Uncle Sam.

At most, defense counsel could try cross-examining the government's witnesses – always a risky undertaking when the witness is an experienced law enforcement officer. And, in this case, equally, if not more risky, with the owner-victim witnesses. Most had suffered economic loss (one had to leave off truck driving permanently; others had spent thousands of dollars refurbishing their trucks; another testified that his wife accused him of having a second wife – his truck), all suffered emotionally (one had had his entire life's possessions in his truck; another had only one of 1500 of its Peterbuilt model built; another first saw the video of his truck being stolen while on the witness stand).

Not much to jiggle and wiggle or fiddle and diddle with on cross-examination there.

Not much more with regard to Wymer's former companions in crime. Some inter-personal animus, readily admitted, as was the hope for gain at time of sentencing. Pretty standard stuff, and part of any defense attorney's standard play book. Sometimes it works; often it doesn't.[4]

---

[2] There was also surveillance evidence from a motel parking lot camera that showed Wymer breaking into and driving away with the owner-victim's truck.

[3] Wymer, annoyed at having thieves in his midst who stole from him, had installed the cameras to make sure no one ran off with what he had stolen.

[4] As one prosecutor once noted, jurors would get the point when he noted in closing argument, "When you go looking for swans, don't expect to find them in the gutter."

That was it: the government and Wymer himself had left his attorneys with nothing else to work with.

**Discussion**

**A. Effectiveness of Representation**

Wymer, trying vainly to dig himself out from underneath the crushing weight of the government's evidence, claims: 1) there was a breakdown of communications; 2) trial counsel were unprepared; and 3) counsel were too busy with other matters to develop an effective trial strategy.

As a result, Wymer claims, his son Shawn's testimony "blind-sided" his lawyers, leaving them unable to conduct an effective cross-examination.

Wymer fails, however, to show how anything his lawyers did or left undone fell short of constitutional norms. Moreover, even if counsel's performance had been deficient, there was no probability of a different result, let alone a reasonable one. Thus, Wymer meets neither of the elements he needs to meet under *Strickland v. Washington*, 466 U.S. 668 (1984), to obtain relief.

**1. Breakdown in Communication**

Six months before trial, Wymer sought to file malpractice charges against defense counsel. After holding a hearing, I found no cause for concern that there had been a genuine, and potentially adverse, breakdown in the attorney-client relationship.[5] *Cf. U.S. v. Reynolds*, 534 F. App'x 347, 371–72 (6th Cir. 2013) (significant conflict between counsel and defendant and breakdown in communications had not required removal and replacement of counsel).

---

[5] Indeed, I was then and yet remain of the view that Wymer's efforts were nothing more than a bogus ploy to postpone his trial.

The same is true here: any putative conflicts and difficulties in communication were one-side and volitional on Wymer's part. There was no reason before or during the trial and there is none now to conclude that any conflicts or problems between Wymer and his attorneys affected Wymer's right fully to enjoy the benefits of the Sixth Amendment.

## 2. Lack of Preparation

Wymer's complaints about the alleged lack of adequate preparation focus primarily on his contention that his son Shawn's testimony "blind-sided" his lawyers. According to Wymer, his attorneys failed to point out inconsistencies between Shawn's pre-trial statements to the government and his testimony at trial.

Having asserted that differences between his son's pretrial statements and trial testimony existed, Wymer presumably knows that of which he speaks. But he identifies no such inconsistencies in his motion.

Moreover, and more to the point, there can be no question that his attorneys knew well before trial the foundational facts of the case, the likely testimony of all the witnesses, including Shawn, and the content of all the government's exhibits.[6]

Wymer offers nothing to substantiate his claim of lack of preparation other than his own speculation. To the extent that he bases that speculation on any deficiencies he believes that he observed, from his layman's viewpoint, during the cross-examination of Shawn, he simply cannot

---

[6] This is so because the government in this Court follows the laudable practice of providing defense counsel with what it has and knows about the case, subject, in infrequent instances, to the need to protect a witness's identity or other justifiable circumstance. It is, moreover, my unvarying practice to confirm during the pretrial phase of every case that the government has followed that practice.

attribute those self-perceived deficiencies to ignorance on his lawyers' part as to what Shawn would tell the jury.[7]

Wymer also appears to fault how the attorneys responded to the admission, on evidentiary grounds, of the evidence from the pole camera and his own inside surveillance equipment produced and provided to the government. This gave – literally – graphic (and vivid) insight into what the other evidence showed: namely, extensive GPS tracking of Wymer's nocturnal movements from the chop shop to and from where trucks were stolen and the chop shop where they were dismembered. At bottom, however, the video depictions, worth, at least, the proverbial thousand words, emphatically corroborated the other evidence. That other evidence, was, moreover, mutually corroborative.

Wymer's complaints about how the witnesses identified him and his movements as depicted in the video format also ignore the fact that his former confederates were not just eyewitnesses to, but also joint participants in, those activities. In sum, they were the evidentiary equivalent of belt and suspenders.

Counsels' handling of the evidence was not deficient, and certainly not constitutionally so.

### 3. Lack of a Trial Strategy

As noted above, in light of what Wymer's proffer had provided to the government, his attorneys' options were extremely limited: they had to devise a strategy that simultaneously

---

[7] On these facts, any dispute Wymer may have with the scope and content of the cross-examination of Shawn is not sufficient to prove deficient performance. *E.g.*, *Smith v. Smith*, 2013 WL 5410125, *4 (N.D. Ohio) (Katz, J.) ("In particular, decisions about whether to cross-examine a witness and to what extent to cross-examine are committed to the realm of trial strategy, and, unless a petitioner can show that the counsel neglected his duty to exercise his discretion, courts must avoid second-guessing trial stragtegy.").

challenged the prosecution's case and yet was not inconsistent with his proffer statements. A nigh impossibility were they to call Wymer to the stand or even present other evidence. To avoid being inconsistent, and thereby releasing the Damoclean Sword, any evidence – his own testimony or anything else – had to be inculpatory, and thus equally fatal to his defense.

Wymer's proffer had, therefore, boxed in both himself and his lawyers.

That left only the Fourth Amendment challenge to the pole camera videos. Rather than, as Wymer complains, being "insanity" and riding a "one-trick pony," that strategy was the only sensible thing for his lawyers to do.

### 4. Preparation for and Performance at Trial

Wymer claims his attorneys failed to conduct an adequate independent pretrial investigation and "depended on the AUSA's investigation . . . making them an agent for the prosecution." Wymer fails completely, however, to suggest, let alone establish, what such "independent investigation" would have uncovered and made available to his lawyers on his behalf.

The issue is not merely such things as: what exculpatory witnesses, what counter-technologically-generated evidence, what might there have been to refute the government's evidence? This issue is, rather, of what use would such evidence have been, even if Wymer had, as he has not, suggested that such evidence existed? Given the proffer and the consequences of offering testimony or other evidence inconsistent with that statement, anything of that sort, even if Wymer had pointed to its existence in his motion, would have been worse than worthless – it would have been self-immolative.

Wymer complains – and to potentially the same self-destructive effect – that counsel did not subpoena any defense witnesses to counter the prosecution's evidence.[8]

Finally, Wymer complains that his lawyers and I refused to permit him to review the discovery his lawyers obtained from the government. In his ill-informed belief, he maintains that, "If counsel was not adequately preparing for trial, then Wymer deserved a right to fight for his own life."

But the law does not entitle even defense counsel to discovery of the sort that the government routinely provides, and in this case provided. *E.g.*, *U.S. v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988) ("the discovery afforded by [Criminal] Rule 16 is limited to the evidence referred to in its express provisions").

That being so, no defendant is entitled to know the government's case before it starts presenting it. In any event, even when defense counsel has, in effect, in hand the government's file, he or she is under no legal obligation to share its specific contents with the defendant. Indeed, even if the government doesn't expressly prohibit such display – which, as it was entitled to do, it did here (Docs. 24, 38) – allowing the defendant to review the file first-hand would no doubt be, for the government, entirely unwelcome.

In sum, there was nothing insufficient in what Wymer's attorneys did to get ready for trial, nor was there anything to be faulted with their performance at trial.

---

[8] And, in any event, Wymer does not tell us (as, presumably, he never told his lawyers) just who there might be who could provide exculpatory evidence.

**B. Prejudice**

Simply put, even if somehow someone could find fault with something that Wymer's attorneys did in the course of their representation, nothing of that sort could possibly have affected the outcome. On the one hand, the government's evidence hemmed in the defendant. On the other hand, his proffer hemmed in his attorneys, leaving them no place to turn, and him with no place to hide.

**Conclusion**

There is no merit to any of Wymer's contentions.

It is, therefore

ORDERED THAT:

1. The motion to vacate under 28 U.S.C. § 2255 (Doc. 589) be, and the same hereby is, denied; and

2. No certificate of appealability will issue, as reasonable judges would not disagree with my resolution of this case.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge