IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF OHIO,
WESTERN DIVISION

United States of America,

    Plaintiff,

        v.

Michael G. Wymer,

    Defendant.

Case No. 3:13-cr-00134-01

Judge James G. Carr

**ORDER**

    The Defendant has filed a Motion for Compassionate Release or Sentence Reduction. (Doc. 697). He seeks an Order reducing his sentence of 324 months to time served in order to obtain medical care outside of the Bureau of Prisons (BoP). (*Id.*, pgID 7635). Specifically, Defendant states he had quadruple bypass surgery in December 2023, but "he is not receiving the care needed to avoid…declining into a terminal condition…." (Doc. 697, pgID 7635).

    On January 3, 2024, he applied for relief through the BoP's administrative process. (Doc. 698-1, pgID 7659). On January 17th, the Warden denied his request. (Doc. 703 SEALED, pgID 7728).

    For the reasons that follow, I deny the Motion, first, as to his claims for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). And I further decline to reduce his sentence.

## Background

    Following a multiple-day trial in September 2014, a jury convicted Defendant on fifteen Counts. These were 1 Count of Conspiracy; 4 Counts of Interstate Transportation of Stolen

1

Vehicles; 8 counts of Interstate Transportation of Stolen Goods, Aiding/Abetting; and 2 Counts of Theft of Interstate Shipments by Carrier, Aiding & Abetting).[1]

At the time of sentencing, Defendant's Total Offense Level was a 36. (Doc. 429 SEALED, pgID 3634). He had accumulated a massive 24 criminal history points, leading to a Criminal History Category of VI. (*Id.* at 3644). His Guideline Range was 324 to 405 months. (*Id.* at 3651).

On May 4, 2015, I sentenced Defendant to the lowest end of the range (324 months).[2] (Doc. 445 – Judgment). I note that thereafter, and for years prior to his bypass surgery, Defendant sought multiple ways to attack his conviction and sentence.

He first filed an appeal to the Sixth Circuit. (Doc. 470). After the Court of Appeals affirmed Defendant's conviction and the U.S. Supreme Court denied *certiorari* (Doc. 560), Defendant attempted to vacate his sentence through a *pro se* § 2255 action. (Doc. 589). Denial of the § 2255 action (Doc. 596) prompted another appeal (Doc. 598), which was denied. (Doc. 616). After securing new counsel, Defendant filed his first Motion for Compassionate Release on November 23, 2021. (Doc. 697). Then, he argued his health conditions, coupled with the risk of exposure to Covid-19, warranted release. I promptly denied that Motion. (Doc. 683).

Under authorship by yet another attorney, Defendant filed the instant Motion for Compassionate Release or Reduction of Sentence. (Doc. 697).

---

[1] Though Defendant admitted guilt following his arrest, he decided to stand trial. Defendant states that he did not go to trial because of asserted innocence, but because he "…was led to believe that there were only two options - the government's plea deal or trial." Even at sentencing, Defendant was adamant that he would appeal, never expressing remorse or acceptance.

[2] 60 months on Count 1; 120 months each on Counts 3 and 4; and 24 months on Count 5; all to run consecutively; 120 months each on Counts 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17 all to run concurrently. (Doc. 445, pgID. 3731).

The Government opposed the Motion. (Doc. 702). Defendant filed a Reply. (Doc. 705). On May 14, 2024, I held a status conference, during which I directed defense counsel to provide an expert to attest to Defendant's life expectancy, quality of care, etc...

Counsel filed the IME Report on September 12, 2024. (Doc. 710 SEALED). The Government filed a Supplemental Response in Opposition. (Doc. 715 SEALED). Finally, Defendant filed his Sur-Reply on November 25, 2024. (Doc. 716).

## Factual Summary

This is a criminal case in which Defendant and thirteen others were convicted on multiple counts relating to the theft of 12 owner-operated trucks, 22 trailers, 24 ATVs and motorcycles, catalytic converters, copper, aluminum, and other scrap metals. (Doc. 429 SEALED, pgID 3630-32). More specifically, Defendant led the conspiracy, comprised of primarily family members. He and his co-conspirators ran the trucks through two "chop shops" in Toledo – one owned by Defendant and the other by his brother.

The Defendant's confederates would scout trucks with cargo. Defendant would break into these tractors and trailers and transport them to the chop shops. There, they were broken down, and the disassembled vehicles and contents were sold for scrap metal. (*Id.* at 3628-30).

In less than a year, 73 victims of the Defendants' crimes suffered losses exceeding $3 million dollars. (Doc. 531, pgID 6590, 6616).

The evidence against Defendant was substantial. Following a tip, the Ohio Bureau of Criminal Investigation attached a camera to a pole overlooking the chop shops. Upon execution of search warrants, the officers obtained incriminating evidence from Defendant's own surveillance cameras, as well as additional evidence through GPS transmitters and cell site records.

Prior to the instant conviction, Defendant had already acquired a lengthy history of serious felony and misdemeanor convictions. (*Id.* at 3635-47). Most of these convictions involved theft, burglary, receiving stolen property and other related crimes. (*Id.*).

This case was the Defendant's fourth federal conviction relating to theft of trucks and his second before me. (*Id.*). See also, *United States v. Wymer,* No. 3:97-cr-00724-12. He also had numerous state convictions for similar conduct. (*Id.*). In fact, at the time of this crime, Defendant had just completed a state sentence for receiving stolen property. (Doc. 702, pgID 7712, citing, Doc. 528, pgID 5983-85; Doc 429 SEALED, pgID 3643). Within a month of his release, he and his confederates began the "chop shop" operations, which led to the instant indictment, conviction, and sentence. (Doc. 429 SEALED, pgID 3629).

**Analysis**

To obtain relief on a motion for compassionate release under 18 U.S.C. §3582(c)(1)(A), I must find "extraordinary and compelling" circumstances justify release/reduction; release/reduction would be consistent with policy statements issued by the U.S. Sentencing Commission; and granting release is not in derogation of the § 3553(a) sentencing factors. *United States v. Elias,* 984 F.3d 516, 518 (6th Cir. 2021).

Effective November 1, 2023, the U.S. Sentencing Commission updated the Guideline's Policy Statements to define "extraordinary and compelling." Medical circumstances are now considered "extraordinary and compelling" if the defendant suffers from:

A. A terminal illness with an end-of-life trajectory;

B. A serious physical or medical condition that substantially diminishes the ability to provide self-care in a correctional facility from which the defendant is not expected to recover; or

C. A medical condition that requires long-term or specialized medical care not being provided and without which the defendant is at risk of serious deterioration.

4

U.S.S.G. § 1B1.13(b)(1) ("Medical Circumstances").

Analyzing his claims under (b)(1), I conclude Defendant has not satisfied any of these criteria.

He does not have a terminal condition with an expected amount of time to live. He has not claimed an inability to provide self-care at the BoP. To justify release, he claims that after having a quadruple bypass operation about a year ago, he has since not received adequate care from the BoP. However, the facts of record undercut his claim that his present medical treatment ignores his needs. His contentions are simply conclusory.

The records show Defendant is receiving care. To his credit, he continues to work, albeit even if light duty. Apart from the bypass, Defendant, when sentenced, had the same medical conditions of which he now complains (diabetes and high blood pressure) when sentenced in 2015. (Doc. 429 SEALED, pgID 3648-49). And as of March 2024, staff reported Defendant presented no complaints of being unable to care for himself. (Doc. 703-2 SEALED).

Additionally § 1B1.13(b)(2) includes circumstances based on advanced age, combined with deteriorating physical or mental health. To qualify under this subsection, a defendant must be at least age 65 and have served the lesser of at least 10 years or 75% of the term imposed. U.S.S.G. § 1B1.13(b)(2) ("Age of the Defendant").

Examining his claims under (b)(2), Defendant, now age 66, filed his motion after serving ten years of his sentence. He therefore is technically eligible. U.S.S.G. § 1B1.13(b)(2). However, serious deteriorating physical health is an additional requirement. I do not find his conditions meet this qualification. Looking back to 2015, in hopes of a lesser sentence, Defendant – then 56 – argued he suffered from obesity, high blood pressure and diabetes; that his father died at age

66; and Defendant could as well. Yet, at present, Defendant, still with those same conditions, is now ten years older and the very age – 66 – at which he father passed. (Doc. 531, pgID 6602).

Furthermore, the IME I ordered seven months ago does not support compassionate release. Dr. Bruce Decter opines Defendant has cardiac disease and needs proper monitoring, follow-up, and treatment from a cardiologist. (Doc. 710 SEALED, pgID 7801). He opines the BoP did not spend an appropriate amount of time checking his vital signs; Defendant should have been referred to a cardiologist sooner; and he should have had more than one ECG in seven months. (*Id.* at 7800).

The Government, in turn, argues that Dr. Decter's assertion regarding vital checks is simply inaccurate. (Doc. 715 SEALED, pgID 7812-14). Even outside of the prison system, it is not extraordinary to have to wait months for referral to a specialist. (*Id.*). Defendant's chronic fatigue could be attributed to obesity, but this was not addressed. (*Id.*). Most importantly, Dr. Decter does not opine Defendant is incapable or providing self-care. Nor are his conditions untreatable in a prison environment. (*Id.*). The Government argues. simply nothing about Defendant's medical conditions is extraordinary or compelling

I find the Government's arguments persuasive. Additionally, even Dr. Decter notes since Defendant had his bypass surgery, he was seen by the BoP's medical unit eleven times. And after the most recent visit in May 2024, during which he complained of shortness of breath and exertional fatigue, he was referred for a cardiology consult. (*Id.*).

In response to the Government's contentions, Defendant asserts that his condition is worsening due to advanced age. (Doc. 716). In October 2024, he received four stents, underwent another nuclear test, and his heart is pumping only at 40%. (*Id.,* pgID 7835).[3]

Yet, Defendant has not sought, as the Government notes, transfer to a BoP hospital facility. That being so, it's fair to ask: On what possible grounds should I grant his motion – considering that his basic complaint is the state of his health and the need for more adequate medical care?

Simply put, I find no grounds upon which to grant compassionate release. Defendant has failed to support his contention that his circumstances are compelling and extraordinary because of a lack of appropriate health care.

In other words, from the record before me, it appears that the care he is receiving is appropriate for his conditions. As the Government points out, those conditions are not that unusual for a man of his age and medical history, particularly given his obesity.

The facts that he does only very light work; that he cannot walk across the prison yard without becoming fatigued; or that he needs to stop to overcome shortness of breath are not, under all the circumstances, at all surprising. Certainly, there is nothing extraordinary in those circumstances, given his overall condition, age, and status as a post-bypass individual.

Finally, Defendant argues if the Court is unable to conclude entitlement to relief under (b)(1) or (2), § 1B1.13(b)(5) warrants release. This encompasses the "other reasons" definition of extraordinary and compelling. "The defendant presents any other circumstances or combination of circumstances that, when considered by themselves or together with any of the reasons

---

[3] Defendant also now writes in a letter that an eye doctor is concerned because his eyes are "bleeding." (Doc. 716-1). But this seems to be a new claim and not within the scope of his counsel's arguments.

described in paragraphs [(1) Medical Circumstances; (2) Age; (3) Family Circumstances and (4) Abuse Victim while Incarcerated]." § 1B1.13(b)(5). I certainly do not find his family situation or abuse to be any factor whatsoever in this case. And, as already stated, I do not find he meets the age or medical circumstances categories. So, I decline to apply this provision.

In sum, I agree with the Government that Defendant has failed to meet the first element, namely, that his circumstances are extraordinary and compelling. They are not.

Having found that there is nothing extraordinary – much less compelling – to warrant release under § 3582(c), I need not consider the § 3553(a) factors. But I do so anyway. And when considering those factors, I'm even more convinced I must deny Defendant's Motion.

**1. Nature and Circumstances of the Offense.**

This is the last of a lengthy series of felonies, including the prior crime for which I imposed a 27-month sentence for similar conduct. (Doc. 441, Case No. 3:97-cr-00724). Defendant and his confederates were indicted for stealing nearly three dozen tractors and trailers and their contents. They chopped them up and sold everything they could for scrap, sometimes traveling as far to a Pennsylvania scrap yard to make money.

To target victims, they would go, as they called it, "shopping." By this, they meant they would drive, at various times, on various occasions, and in various distances to commit the crimes. They would look for trucks in isolated circumstances – often going through some initially without finding cargo that they could convert readily into cash. Once they found the one they wanted, they would break into the vehicle and drive off with it.

8

Of the twenty-six instances of theft, the Government charged fourteen individuals in a seventeen-Count indictment. For those owners who testified, the testimony was riveting.[4] It was clear that they had lost more than their livelihood. They were not employees of some major national trucking companies – what they owned was their means of earning a living. It was clear that many were proud of what they did and how they sustained their living.

Perhaps the most heart-wrenching testimony came from an owner-operator, who had left his truck in a motel parking lot. A nearby video camera caught Defendant breaking into it and driving away. Not quite the same as how a parent must feel watching a mall surveillance camera of his or her child being taken away, but devastating, nonetheless.

This is but a small sampling of the audacity of the Defendants and the extent of their crimes. And after all, Defendant, who now seeks mercy from the Court, was the mastermind, the ring leader, the head of this devastating conspiracy.

For Defendant, the motivation – time after time – was greed, which he manifested callously and indifferently. Defendant's actions of harming over seventy victims, led me to order restitution of $2,276,860.48. This restitution tells part of a story as to why, when weighing the § 3553(a) factors, Defendant does not warrant reduction or absolution.

**2. Defendant's History and Characteristics.**

Revisiting the Presentence Report tells another part of the story. At the time of sentencing in 2014, Defendant had accumulated 24 criminal history points. He began his criminal lifestyle

---

[4] Among other things, I remember how one owner-operator showed a picture of himself and his wife in front of his stolen truck. He said his wife called the truck his "second wife." Another victim lost everything he owned, including past tax returns that were in his truck when the Defendants took it. One victim's company jacket was found in the Defendant's facility. He had left the coat in his stolen truck. (Doc. 702, pgID 7716, citing, Doc. 508, pgID 4441-42). Another truck was one of 1500 Peterbilt made of that model – which made it very rare and expensive when stolen.

as a minor. He was eventually bound over to Lucas County Common Pleas Court at age seventeen and sentenced to serve 4-25 years for Aggravated Burglary.[5]

He seemingly never stopped until he was arrested and incarcerated for this crime in his mid-fifties. Multiple lengthy prison sentences, particularly during his twenties and thirties, did not deter him.

Even when I handled my first case involving Defendant in 1997, when he was nearly thirty years younger and not the head of a fourteen-defendant indictment, his Criminal History Category was a VI. (PSR, 3:97-cr-00724-12 SEALED).

Apparently when I sentenced him in that case in February of 1999, Defendant did not bat a rehabilitative eyelash. He was convicted four more times, receiving 14 months for Receiving Stolen Property and 17 months three years later for the same crime at age fifty. (Doc. 429 SEALED, pgID 3642-43).

The conclusion of the story is not surprising. Simply put, the Government is spot on when it says Defendant is a "Career Criminal." Incarceration seems to be the only deterring factor as he has been unable to commit crimes during the ten years he has served this sentence.

3. **Promote Respect for the Law, Provide Just Punishment, Reflect the Seriousness of the Offense, Provide Adequate Public and Individual Deterrence & Protect the Public from Further Crimes**

Lumping these factors together, I am not convinced Defendant, if released, would not rewrite the story of being a "Career Criminal." He has not thus far.

---

[5] For eleven years before becoming a Magistrate Judge, I was actively involved in Juvenile Court delinquency proceedings, first as a Legal Aid Attorney, then as a Clinical Law Professor. I can attest that the Defendant's bind over to Common Pleas Court was not typical.

Defendant submits that "things are different now," and "nine years of incarceration have allowed him to work to overcome the presumption that he would re-offend." He submits his rehabilitation efforts, coupled with his age, the declining rate of recidivism, and deteriorating health due to aging, show he "would not return to a life of crime…." Defendant claims he would work "in a lawful profession" and continue making his restitution payments for the remaining days he has "left on this earth."  (Doc. 705, pgID 7780).

That is assuming a lot. That he would secure gainful employment at this stage of the game hardly seems possible. And quite frankly, I cannot take the risk he would not continue to do what he has done for half of a century: commit serious crimes, enlist others to commit those crimes, and benefit from unsuspecting victims.

And I certainly find nothing extraordinary or compelling about Defendant's putative rehabilitation. (Doc. 698, pgID 7655-56). He has simply done what he is expected to do to earn good time. To be sure, that is a factor in assessing his present characteristics, but given everything else, it is far from compelling.

 The Defendant's own past crimes, the consequences of which did not deter him whatsoever, is the best indicator. I am convinced the only way to keep him and his confederates from resuming their nocturnal "shopping" and plunder is to keep Defendant incarcerated. This is especially so as, given the fact that many of his confederates were members of his own family. He expects to return to live with his family, and yet, he cannot associate with known felons.

 Not only do I believe release is improper, I also will not reduce his sentence. Sentencing Guideline § 1B1.13 further specifies that a reduction in sentence is only appropriate if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

11

Defense counsel argues, Defendant "presents nothing to indicate that…he is a danger to society." I disagree. Albeit Defendant is now 66, but as the Government notes, his criminal history is not limited to theft and receipt of stolen property. He also has a history of violent offenses, including aggravated burglary, assault, arson, and vehicular homicide. The instances of alleged domestic violence and other violent crimes not resulting in conviction at least bear mention. Also, Defendant, at age 56, is alleged to have committed assault against another inmate while awaiting trial in this matter. (R. 429, pgID 3635-47). And, in 2017, while in prison for this case, he was sanctioned for fighting with another person. (*Id.* at 3647).

To promote respect for our laws; to ensure adequate deterrence; and to protect the public from Defendant, I must deny his Motion. Defendant's crimes are repetitive and serious. And for that, his sentence just.

### 4. Provide the Defendant with Needed Medical Care

It is, at this point, probably as likely that Defendant will get the care he needs while confined in one of the BoP's facilities as if he were released. I simply do not find he is not receiving adequate care.

Defendant points to his obesity and diabetic condition – citing the lack of food at FCI Milan suitable for someone with those conditions. While I agree that prison food is not designed for a diabetic, records show Defendant is not always compliant with taking medications and refuses insulin to control his glucose levels. (Doc. 703-2 SEALED, citing BEMR notes 3-14-22 and 3-20-23). So, one might argue he is jeopardizing his own health more so than the food.

I also assume if Defendant were to request transfer to a BOP hospital facility, that problem, and the other alleged inadequacies in his treatment, might be remedied. But he has not availed himself of that opportunity. So this factor too seems inconsequential.

### 5. Other § 3553(a) Factors

Suffice to say when weighing the remaining factors warranting release (*i.e.* kinds of sentences available, the applicable ranges, unwarranted sentencing disparities, need to provide restitution), I considered my sentence to be just when pronounced. Both on the basis of incapacitation, on the one hand, and retribution on the other. This was particularly so – and still is – because Defendant is a multiple repeat offender.

I cannot overemphasize just how serious the Defendant's offenses were. To be sure, no one became addicted or physically harmed. Yet, each of the victims – and not just those who testified – lost, at a minimum, the wherewithal by which they made their daily living. Some lost their employment - no truck; no job. Another had to drop out of college. Some victims still owed payment on their vehicles. Defendant and his confederates made meeting their obligations, at best very difficult, if not, impossible. The harm that Defendant caused was not just financial. It became readily apparent to me that it was also emotional. The victims clearly took pride, not just in their work, but also in what enabled them to do it – their trucks.

Defendant was appropriately sentenced for the fifteen crimes for which he was convicted. He was, after all, the mastermind of the conspiracy operations. And I sentenced him to the lowest end of the range. That is the compassion I gave him. To grant compassionate release or sentence reduction at this time would put a lie to that fact. This is every bit an important consideration as it was a core consideration when I pronounced my sentence ten years ago.

The totality of the circumstances justify no less.

### Conclusion

Defendant is not entitled to compassionate release or sentence reduction. There is nothing either extraordinary or compelling about his circumstances. The record is clear. The somewhat

flawed expert's report gives no reasonable basis for concluding that he is not receiving the care to which he is entitled as a BoP inmate. FCI Milan is not the Mayo Clinic, the Cleveland Clinic, or even the Toledo Hospital.

Nor need it be. Defendant needed a coronary bypass. And he got one.

Defendant points to no other condition – including diabetes – that the record in this case reflects is not being adequately addressed. Unfortunately, there are many elderly inmates in the Federal prison system, some much older than Defendant. But, that is a direct consequence of the Sentencing Reform Act, the Sentencing Commission and its Guidelines, and – ultimately – Defendant's own conduct.

In any event, aside from the lack of either extraordinary or compelling circumstances peculiar to him, almost every sentencing factor under § 3553(a) precludes him from having his motion granted. Having spent much of his life committing crimes – and very serious devastating crimes at that. He should not feel put upon by the fact that he might well end his life in prison. But he chose not to think about that and instead focused on and succumbed to his own criminal impulses. That is what put him where he is and the bleak path that may well lie ahead. But in the end, the fault – and the blame – are his alone.

Accordingly, it is hereby,

ORDERED THAT:  The Defendant's Motion for Compassionate Release or Motion for Sentence Reduction (Doc. 697) be, and the same hereby is, **denied.**

An appeal from this decision could not be taken in good faith and shall not occur without prepayment of the appropriate filing fee.

So ordered.
Date: 1/10/2025

/s/ James G. Carr
Sr. U.S. District Judge